Filed 5/13/13  In re C.R. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re C.R. et al., Persons Coming Under the Juvenile Court Law. | 2d Juv. No. B245355 (Super. Ct. Nos. J1395601, J1395602) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE  SERVICES,  Plaintiff and Respondent,  v.  A.W.,  Defendant and Appellant. | |

A.W., the mother of C.R. and M.A., appeals an order of the juvenile court terminating her visitation rights with her children after the juvenile court terminated her family reunification services.  The Santa Barbara County Child Welfare Services (CWS) filed a juvenile dependency petition (Welf. & Inst. Code, § 300) on October 11, 2011.[1] We conclude, among other things, that the court did not abuse its discretion in terminating visitation.  We affirm.

FACTS

On October 6, 2011, a motorist saw M.A., A.W.'s two-year-old son, on a sidewalk wearing only a diaper "near a busy traffic road."  A.W. had left him in the care of

---

[1] All statutory references are to the Welfare and Institutions Code.

C.R., her 10-year-old daughter, at a motel. After A.W. left the children unattended, C.R. fell asleep and M.A. left the motel and went outside near traffic.

A law enforcement officer contacted A.W. and asked her to "return to the motel." A.W. responded she "could not return immediately." She "did not appear to be concerned and did not seem to think there was a problem with the arrangements she made for the children."

The conditions in the motel room where the children had been living were "deplorable." A 30-gallon "bag of garbage" was near one of the beds, the children were "unkempt" and had "no clean clothes." The clothes they had were "moist" and contained "mold." C.R., a fifth grader, had not attended school regularly and had been "discharged from the school due to absences . . . ." A.W. had not taken C.R. or M.A. to any medical examinations since they arrived in Santa Barbara County. When asked if the children "are up to date on their immunizations," A.W. responded that she "cannot remember."

CWS determined that "[a]lthough transitional housing has been available and offered to the family, the mother's lack of cooperation and unwillingness to follow [the] shelters' rules has led to the termination of services." CWS placed the children in a "confidential licensed shelter home." The juvenile court found that the children were persons who came within Welfare and Institutions Code section 300 and "[c]ontinuance in" A.W.'s home was "contrary" to the children's welfare.

On November 17, 2011, CWS filed a jurisdiction/disposition report stating that the children should be declared "dependents" of the court, and A.W. should be offered family reunification services. It prepared a case plan requiring A.W. to, among other things: 1) "obtain and maintain the resources necessary to provide her children with a safe and stable living environment," 2) demonstrate her ability to "adequately parent her children," and 3) "address her mental health needs" and attend therapy sessions.

After a jurisdiction hearing, the juvenile court found the allegations of child neglect by A.W. as alleged in the dependency petition were true. It declared the children to be dependents of the court, and it found CWS had prepared a reasonable case plan. It ordered CWS to provide family reunification services to A.W.

In a May 2012 status review report, CWS requested the juvenile court to terminate family reunification services. It said A.W. did not complete her case plan requirements. A.W. failed to find employment and did not "pursue employment." She did not complete her parenting classes and did not comply with CWS's direction to attend therapy sessions. She did not find housing. She was asked to leave a shelter because "she was involved in an altercation with another resident." CWS said A.W. did not show an ability "to adequately supervise and protect her children from harm, and provide for their basic needs."

On June 28, 2012, the juvenile court terminated family reunification services. It found the "current situation" is "essentially the same as when the children were removed." There was no showing A.W. made progress in obtaining a stable home environment for the children. It noted she made some efforts to obtain counseling, but progress in that area "was not significant." In reviewing the services provided to A.W., the court found CWS used "their best efforts to help" her.

In October 2012, CWS submitted an addendum report requesting the juvenile court to terminate A.W.'s visits with the children because it was not in the children's "best interest."

After an evidentiary hearing, the juvenile court found, "[T]here is clear and convincing evidence that visitation between the mother and children is contrary to the children's safety and well-being. The Court orders that pending the 366.26 hearing . . . there shall be no further visitation."[2]

## DISCUSSION

### *Substantial Evidence*

A.W. contends the juvenile court erred because there is no substantial evidence to support the court's findings on terminating visitation. We disagree.

We view the record in the light most favorable to the challenged order. We must draw all reasonable inferences from the record in support of it. We do not weigh the

---

[2] We have granted A.W.'s request to augment the record.

evidence, assess credibility or resolve conflicts on factual issues, as that is exclusively the domain of the juvenile court. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

"Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) After the termination of reunification services, the court must set a hearing (§ 366.26) to "implement a permanent plan for the children." (*Marilyn H.*, at p. 309) "The court shall continue to permit the parent . . . to visit the child pending the hearing unless it finds that visitation would be detrimental to the child." (§ 366.21, subd. (h).)

A.W. claims the record does not support findings that visitation would be detrimental or contrary to the children's best interests. We disagree.

CWS noted that it had provided "thirty-nine twice a week two-hour visits" for A.W. with her children. But she missed 10 visits, and for each missed visit, the children were transported to the area and "were left waiting for [A.W.] to arrive to a visit that was not going to happen." A.W. was "over forty minutes late" to four visits and 15 minutes late to five other visits. For these supervised visits, the CWS case aide "went out of her way to help [A.W.] by picking her up at different bus stops" to "help facilitate the visits." In April 2012, A.W. requested the visits be reduced to only once a week even though her CWS case worker advised her this reduction would be "detrimental to her and her children." In May, A.W. requested twice a week visits.

After the juvenile court terminated family reunification services, the court reduced the visits to once a month. A.W. went to three visits, but cancelled her October 12, 2012, visit. C.R. "expressed disappointment" and told the CWS worker that she was "sad" A.W. "did not come for the visit."

The CWS case aide documented that the visits "were often chaotic" and A.W. "did not always come prepared." A.W. disobeyed instructions by her CWS worker and the case aide. They told her not to bring "sugary drinks, cookies, and candy." But A.W. brought these prohibited foods to the visits. She also was not prepared and forgot to "bring items to the visits." As a result, the case aide had to drive A.W. to a market "which decreased her visitation time." A.W. asked the CWS case aide to watch M.A. while she

4

shopped. The aide had to "continually" remind her that she needed "to include both children during her visit time." At various times, A.W. "expected" C.R. "to supervise her brother." CWS noted that by doing this, A.W. was "re-enforcing the parenting role" she had previously imposed on C.R. During most visits, she spent time with C.R. "and ignored" M.A.

CWS noted that A.W. "was *unable to provide appropriate supervision for* three-year old [M.A.] *during almost all of the visits*." (Italics added.) On "more than one occasion," she allowed M.A. "to run off towards busy streets, without trying to stop him." This placed the child "at *imminent risk of being hit by a car* or truck." (Italics added.) She allowed M.A. to be "alone in a shopping cart at Wal-Mart" while she was two aisles away, "placing him at imminent risk of either hurting himself, or allowing a stranger to abduct or hurt her child." She did not intervene when M.A. was playing "alone" too close to a "duck pond at the park," which "could have resulted in drowning." She allowed M.A. "to play out of her sight on different playgrounds without checking on him, placing him at risk of being hurt or abducted." She did not follow the recommendations of the CWS case aide on how to control M.A.'s "frequent tantrums." She ignored M.A. "when entering elevators or escalators." On one occasion, after hearing M.A. cry, she had to "'jerk him by his sweatshirt hood' to prevent him from falling."

CWS said M.A. has "emotional dysregulation." After "visits with [A.W.], he regresses, and throws tantrums . . . ." But "[a]fter a few days, these behaviors decrease." C.R. "began to appear withdrawn during visits with [A.W.]." She was "emotionally shut down during visits, and crying silently" because A.W. did "not address her . . . emotional needs." CWS said that A.W.'s "inconsistent visits throughout the past twelve months . . . [have] affected both children emotionally." After a visit with A.W., M.A. "will spend an entire weekend screaming, kicking, and tantruming. His current home wants to provide [M.A.] with stability . . . ." CWS determined that A.W.'s "inability to provide consistent and stable parenting during visits is detrimental to [the children's] emotional stability" and does "not benefit either child."

5

A.W. contends the juvenile court should have ordered psychological counseling.  But CWS referred M.A. to a counseling program.  It attached a report from a "staff clinician" of the Great Beginnings Program at "CALM" who confirmed that M.A. had "difficulty regulating emotional states" after "visitations with" A.W.  The court could reasonably infer this was consistent with CWS's determination about the impact of the visits on the child's emotional stability.

A.W. notes that she testified that she missed visits because of transportation problems and C.R. "was fine" during visits.  But the issue is not whether some evidence supports her position, it is whether substantial evidence supports the judgment.  Only the trial judge may decide A.W.'s credibility.  (*Lohman v. Lohman* (1946) 29 Cal.2d 144, 149 ["a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it"].)  The juvenile court's finding that "clear and convincing evidence" showed that continued visitation "is contrary to" the children's "safety and well-being" was a rejection of A.W.'s testimony.  The evidence is sufficient.

We have reviewed A.W.'s remaining contentions and we conclude she has not shown error.

The order is affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.


6

Arthur J. Garcia, Judge

Superior Court County of Santa Barbara

_____

David A. Hamilton, under appointment by the Court of Appeal, for Defendant and Appellant.

Dennis A. Marshall, County Counsel, Maria Salido Novatt, Sr. Deputy, for Plaintiff and Respondent.